# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. CR03-4020-LTS |
| vs. | |
| KURT ALAN CAMPBELL, | MEMORANDUM OPINION AND ORDER |
| Defendant. | |

_____

## I. INTRODUCTION

This case is before me on defendant Kurt Alan Campbell's motions (Doc. Nos. 33, 37) for compassionate release. The Government has filed a response (Doc. No. 39) and Campbell has filed a reply (Doc. No. 42). Oral argument is not necessary. *See* Local Rule 7(c).

## II. BACKGROUND

On October 31, 2003, Campbell pleaded guilty to one count of conspiracy to manufacture and distribute 50 grams or more of actual methamphetamine after a prior felony drug conviction in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii), 846 and 851. *See* Doc. No. 19. At Campbell's sentencing hearing on January 26, 2004, United States District Judge Mark W. Bennett calculated a guideline range of 262 to 327 months, based on a total offense level of 34 and a criminal history category VI. Doc. No. 27-1 at 2. Because the Government had filed a 21 U.S.C. § 851 prior felony drug offense enhancement notice, Campbell's mandatory minimum sentence was 240 months. Doc. No. 27 at ¶ 78. Judge Bennett sentenced Campbell to 280 months' imprisonment. Doc. No. 26.

According to the online Bureau of Prisons (BOP) inmate locator, Campbell is currently at Yankton FPC and his projected release date is May 25, 2023.

### III.  COMPASSIONATE RELEASE STANDARDS

A court's ability to modify a sentence after it has been imposed is extremely limited. One way a court may modify a sentence is through "compassionate release" as outlined in 18 U.S.C. § 3582(c)(1)(A), which was recently modified by the First Step Act of 2018 (FSA). *See* Pub. L. No. 115-391, § 603. In the past, 18 U.S.C. § 3582(c)(1)(A) permitted a court to reduce a defendant's term of imprisonment only upon the motion of the Director of Bureau of Prisons (BOP). The FSA modified § 3582(c)(1)(A) such that a defendant may now directly petition the court "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *See Mohrbacher v. Ponce*, No. CV18-00513, 2019 WL 161727, at *1 (C.D. Cal. Jan. 10, 2019) (discussing modifications made to § 3582(c)(1)(A) by the FSA); *see also United States v. Perez-Asencio*, No. CR18-3611, 2019 WL 626175, at *2–3 (S.D. Cal. Feb. 14, 2019).

If a defendant fully exhausts administrative remedies, the court may, upon motion of the defendant, reduce the defendant's sentence, after considering the factors set forth in 18 U.S.C. § 3553(a) to the extent they are applicable, if the court finds that:

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . .

2

18 U.S.C. § 3582(c)(1)(A). Campbell does not meet the requirements of § 3582(c)(1)(A)(ii). He is under 70 years of age and has not served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c). *See* Doc. No. 27 at 2. Accordingly, Campbell's only possible avenue for relief is § 3582(c)(1)(A)(i).

The starting point in determining what constitutes "extraordinary and compelling reasons" under § 3582(c)(1)(A)(i) is the Sentencing Guideline discussing compassionate release issued by the United States Sentencing Commission. *See* U.S.S.G. § 1B1.13 (U.S. Sentencing Comm'n 2018); *see also United States v. Hall*, No. CR98-7, 2019 WL 6829951, at *3 (E.D. Ky. Dec. 13, 2019); *United States v. Rivernider*, No. CR10-222, 2019 WL 3816671, at *2 (D. Conn. Aug. 14, 2019). The Guideline provides that extraordinary and compelling reasons exist in the following circumstances:

> (A) Medical Condition of the Defendant.—
>
>> (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>>
>> (ii) The defendant is—
>>
>>> (I) suffering from a serious physical or medical condition,
>>>
>>> (II) suffering from a serious functional or cognitive impairment, or
>>>
>>> (III) experiencing deteriorating physical or mental health because of the aging process,
>>
>> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> (B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.
>
> (C) Family Circumstances.—

3

> (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.
>
> (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.
>
> (D) Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

U.S.S.G. § 1B1.13 cmt. n.1.

This Guideline predates the FSA and has "not been amended to reflect that, under the FSA, a defendant may now move for compassionate release after exhausting administrative remedies." *Rivernider*, 2019 WL 3816671, at *2. Courts are split on whether the policy statement is binding because it predates the FSA's changes to 18 U.S.C. § 3582(c)(1)(A). A number of district courts have concluded that Guideline § 1B1.13 cmt. n.1 does not restrain a court's assessment of whether extraordinary and compelling reasons exist to release a defendant. *See, e.g., United States v. Rodriguez*, CR17-00021, 2019 WL 6311388, at *7 (N.D. Cal. Nov. 25, 2019); *United States v. Urkevich*, No. CR03-37, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019); *United States v. Brown*, No. CR05-00227, 2019 WL 4942051, at *4 (S.D. Iowa Oct. 8, 2019); *United States v. Fox*, CR14-03, 2019 WL 3046086, at *3 (D. Me. July 11, 2019); *United States v. Beck*, CR13-186-6, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019); *United States v. Cantu*, No. CR05-458, 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019). Other courts have concluded that extraordinary and compelling reasons exist only if they are included in the Guideline. *See, e.g., United States v. Lynn*, No. CR89-0072, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 13, 2019).

As I have previously stated, I agree with those courts that have found that although the Guideline provides helpful guidance on what constitutes extraordinary and compelling reasons, it is not conclusive given the recent statutory changes. *See United States v. Schmitt*, No. CR12-4076-LTS, 2020 WL 96904, at *3 (N.D. Iowa Jan. 8, 2020); *see*

*also Rodriguez*, 2019 WL 6311388, at *7 (Congress knew that the BOP rarely granted compassionate release requests prior to the FSA, and the purpose of the FSA is to increase the number of compassionate release requests granted by allowing defendants to file motions in district courts directly even after the BOP denies their request); *Brown*, 2019 WL 4942051, at *3 (same).

## IV. DISCUSSION

### A. *Exhaustion of Administrative Remedies*

On September 17, 2019, Campbell submitted an informal resolution form to his unit manager requesting home confinement placement pursuant to the Elderly Offender Home Detention Program (EOHDP) in the First Step Act of 2018 (FSA). Doc. No. 33 at 7; *see also* 34 U.S.C. § 60541(g). His unit manager's response instructed him to review the Operations Memorandum on Home Confinement under the FSA dated April 4, 2019. Doc. No. 33 at 7.

On September 25, 2019, Campbell submitted a written request for home confinement placement pursuant to EOHDP to his warden. *Id.* at 8–9. He stated that he did not receive the Operations Memorandum from his unit manager but believed that he was eligible for home confinement because of his age and he had served at least two-thirds of his sentence. *Id.* at 8. He also explained that his present offense was not a crime of violence and he did not have a history of violence. *Id.* at 9. He noted that he had two prior convictions for domestic abuse, but that they were over 24 years old. *Id.*

On October 3, 2019, the warden replied, stating Campbell would be eligible for EOHDP if not for his two prior domestic abuse assault convictions. *Id.* at 10; *see* Doc. No. 27 at ¶¶ 38, 39. The warden explained that the prior convictions were each a "crime of violence" under 18 U.S.C. § 16(a) and the BOP had determined that Campbell had a history of violence. Doc. No. 33 at 10; *see* 34 U.S.C. § 60541(g)(5)(A)(iii)–(iv).

On October 11, 2019, Campbell filed an appeal with the BOP regional director. Doc. No. 33 at 11–12. He argued that his two domestic assault convictions did not

5

constitute a history of violence. *Id.* at 11. The regional director denied the appeal, confusingly failing to mention EOHDP and instead stating that Campbell would be evaluated 17 to 19 months before his release date to determine if he should be placed on home confinement or in a residential reentry center (RRC) pursuant to the Second Chance Act of 2007 (SCA). *Id.* at 13. On December 22, 2019, Campbell filed an appeal with the BOP central office. *Id.* at 14–15. The BOP central office denied the appeal, agreeing with the warden that Campbell's previous domestic abuse assault convictions preclude him from eligibility for EOHDP. *Id.* at 16.

On April 15, 2020, Campbell filed his pro se motion for compassionate release in this court. *See* Doc. No. 33. On April 29, 2020, I appointed counsel to represent him. *See* Doc. No. 34. On April 30, 2020, Campbell's counsel submitted a request for compassionate release on behalf of Campbell to his warden. Doc. No. 42-1. The request was based on Campbell's health issues and his COVID-19 risk. *Id.* On May 5, 2020, the warden denied the request. Doc. No. 42-2. On May 13, 2020 Campbell filed, through counsel, an amended motion for compassionate release in this court. *See* Doc. No. 37.

Campbell argues that his administrative request for home confinement pursuant to EOHDP satisfies the exhaustion requirement in § 3582(c)(1)(A) because 30 days have passed since his first request to the BOP for relief under the First Step Act. Doc. No. 38 at 4, 8. He argues that while his request and appeals do not mention compassionate release or COVID-19, "[t]here is no statutory or regulatory authority that a district court can only consider the exact circumstances presented to the BOP at the time an administrative request for compassionate release was filed." *Id.* Campbell also points to his counsel's request for compassionate release, which did mention COVID-19 and Campbell's health issues. Doc. No. 42 at 4.

The Government concedes that a defendant exhausts administrative remedies as required by § 3582(c)(1)(A) so long as his motion for compassionate release is filed at least 30 days after the receipt of an administrative request by his warden. Doc. No. 39

6

at 9 n.4. The Government also agrees that Campbell's administrative requests specified that he was requesting home confinement under "the Elderly release program of the First Step Act." Doc. No. 39 at 4; *see* Doc. No. 33 at 8. However, the Government argues that to properly exhaust administrative remedies, Campbell's administrative request had to mention his health issues and COVID-19. Doc. No. 39 at 4, 7. The Government also points out that the request for compassionate release submitted by Campbell's counsel was sent within 30 days of his amended motion. *Id.* at 7.

I have previously held that a defendant need not mention COVID-19 in his administrative request for compassionate release if his request is based on his health conditions and predates the COVID-19 pandemic. *See United States v. Gotschall*, No. CR17-4031-LTS, Doc. No. 356 at 9 (N.D. Iowa June 1, 2020). However, this situation is different. Campbell's initial administrative request did not mention his health in any way. Further, nothing in either the request or the appeals indicated that Campbell was seeking compassionate release, early release or a reduction in his sentence. Nor did his request mention home confinement pursuant to the Coronavirus Aid, Relief, and Economic Security (CARES) Act, which some inmates have confused with compassionate release. *See, e.g.*, *United States v. Hawkins*, No. 2:17-CR-134-JVB-JEM, 2020 WL 3264115, at *1 (N.D. Ind. June 17, 2020) (defendant's request for home confinement could not be construed as a request for compassionate release); *United States v. Carr*, No. 1:13CR34-001, 2020 WL 2847633 (W.D. Va. June 2, 2020) (defendant's request for home confinement pursuant to the CARES Act satisfies the exhaustion requirement in § 3582(c)(1)(A)). Because there is no indication in Campbell's initial administrative request that he was seeking compassionate release, or home confinement based on his medical conditions and/or COVID-19, it does not constitute a request for compassionate release and therefore does not satisfy the exhaustion requirement in § 3582(c)(1)(A).

By contrast, the April 30, 2020, letter submitted from Campbell's counsel to his warden is clearly a request for compassionate release based on Campbell's health and

7

COVID-19. However, Campbell's amended motion for compassionate release was filed on May 13, 2020, well-within 30 days of when the second request was submitted. Section 3582(c)(1)(A) presents, in the disjunctive, that a defendant can file a compassionate release motion either after the full exhaustion of "all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or thirty days after filing a request with the facility warden. Under the latter route, the plain language of the statute requires a defendant to submit an administrative request for compassionate release and then wait at least 30 days before filing a motion for compassionate release in court.

Campbell suggests that § 3582(c)(1)(A) is satisfied if I wait to rule on his motion for compassionate release until 30 days have passed since his second administrative request was submitted. *See* Doc. No. 42 at 3. This is inconsistent with the text of § 3582(c)(1)(A). Campbell's interpretation of the statute would make the 30-day requirement meaningless and allow defendants to file a motion for compassionate release immediately after submitting an administrative request, so long as the court then withholds ruling until 30 days have passed. *See United States v. Cruickshank*, No. CR17-0323JLR, 2020 WL 3266531, at *4 (W.D. Wash. June 17, 2020). This is not what the statute provides.

I cannot excuse Campbell's failure to follow § 3582(c)(1)(A)'s exhaustion requirement before filing his motions for compassionate release. Section 3582(c)(1)(A) unambiguously instructs that a defendant may bring a motion for compassionate release in federal court only "after [he] has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on [his] behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." I agree with the majority of courts to weigh in on this issue that the statutory language makes it clear that a court cannot entertain a compassionate release motion unless a defendant has exhausted administrative remedies—even in light of the COVID-

8

19 pandemic. *See United States v. Smith*, No. CR07-3038-LTS, 2020 WL 2844222, at *5 (N.D. Iowa June 1, 2020) (collecting cases).

In short, Campbell attempted both types of exhaustion but succeeded in neither. Although he completely exhausted his administrative remedies within the BOP, he did so by arguing he was entitled to EOHDP home confinement, not compassionate release for extraordinary and compelling reasons under § 3582(c)(1)(A)(i). And while he then submitted a compassionate release request pursuant to § 3582(c)(1)(A)(i) to his warden, he failed to wait 30 days before filing the present motion. I must deny Campbell's motion for compassionate release because he did not exhaust administrative remedies as required by § 3582(c)(1)(A).

### B.  *Home Confinement Recommendation*

While I must deny Campbell's motion for compassionate release, I will also consider his motion as a request for a recommendation pursuant to either the CARES Act and/or EOHDP. For the reasons set out below, I find that such a recommendation is warranted in this case.

#### 1.  *CARES Act Home Confinement*

The Second Chance Act of 2007 (SCA) was amended and reauthorized in 2018 by the First Step Act (FSA). Under the SCA, the BOP may "place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." 18 U.S.C. § 3624(c)(2). The BOP is directed, to the extent practicable, to "place prisoners with lower risk levels and lower needs on home confinement for the maximum of time permitted." *Id.* The CARES Act provides that, if the Attorney General finds that the COVID-19 pandemic will materially affect the functioning of the BOP, then the director of the BOP "may lengthen the maximum amount of time for which the

9

Director is authorized to place a prisoner in home confinement." Pub. L. No. 116-136, § 12003(b)(2) (2020). The Attorney General made this finding on April 3, 2020.[1]

While the SCA does provide the possibility of home confinement for some prisoners, it is not an independent authority that courts may use to place a defendant on home confinement. *See Stark v. Rios*, No. 19-CV-375 (ECT/SER), 2019 WL 2796766, at *2 (D. Minn. June 5, 2019), report and recommendation adopted, No. 19-CV-00375 (ECT/SER), 2019 WL 2766525 (D. Minn. July 2, 2019). Even after the FSA and the CARES Act, the Attorney General, and by delegation the BOP, has the discretion and exclusive authority to designate the placement of an inmate's confinement. *See United States v. Carter*, No. 10-CR-2010-LRR, 2019 WL 6902745, at *1 (N.D. Iowa Nov. 25, 2019); *Hansen v. Rios*, No. C19-374 (JRT/TNL), 2019 WL 4544205, at *3 (D. Minn. Sept. 19, 2019); *Schlegel v. Rios*, No. 19-cv-338 (SRN/ECW), 2019 WL 3417053, at *4 (D. Minn. June 18, 2019), report and recommendation adopted, 2019 WL 3412207 (July 29, 2019). At most, I may make a recommendation that the BOP place Campbell on home confinement pursuant to the CARES Act. *See* 18 U.S.C. § 3621(b); *United States v. Doshi*, No. 13-cr-20349, 2020 WL 1527186, at *2 (E.D. Mich. Mar. 31, 2020) (granting defendant's motion for judicial recommendation for home confinement); *United States v. Knox*, No. 15 Cr. 445 (PAE), 2020 WL 1487272, at *2 (S.D.N.Y. Mar. 27, 2020) (same).

### 2. *EOHDP*

The FSA re-established and expanded a pilot program under the SCA to place elderly and terminally ill inmates in home confinement. 34 U.S.C. § 60541(g). Pursuant to EOHDP, the Attorney General "shall conduct a pilot program to determine the effectiveness of removing eligible elderly offenders and eligible terminally ill offenders

---

[1] *See* William Barr, *Memorandum for Director of Bureau of Prisons: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19* (Apr. 3, 2020), https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement_april3.pdf.

from Bureau of Prisons facilities and placing such offenders on home detention until the expiration of the prison term to which the offender was sentenced." § 60541(g)(1)(A). In carrying out EOHDP, "the Attorney General may release some or all eligible elderly offenders and eligible terminally ill offenders from [BOP] facilities to home detention, upon written request from either the [BOP] or an eligible elderly offender or eligible terminally ill offender." § 60541(g)(1)(B). An eligible elderly offender means an offender in the custody of the BOP who—

> (i) who is not less than 60 years of age;
>
> (ii) who is serving a term of imprisonment that is not life imprisonment based on conviction for an offense or offenses that do not include any crime of violence (as defined in section 16 of Title 18), sex offense (as defined in section 20911(5) of this title), offense described in section 2332b(g)(5)(B) of Title 18, or offense under chapter 37 of Title 18, and has served 2/3 of the term of imprisonment to which the offender was sentenced;
>
> (iii) who has not been convicted in the past of any Federal or State crime of violence, sex offense, or other offense described in clause (ii);
>
> (iv) who has not been determined by the Bureau of Prisons, on the basis of information the Bureau uses to make custody classifications, and in the sole discretion of the Bureau, to have a history of violence, or of engaging in conduct constituting a sex offense or other offense described in clause (ii);
>
> (v) who has not escaped, or attempted to escape, from a Bureau of Prisons institution;
>
> (vi) with respect to whom the Bureau of Prisons has determined that release to home detention under this section will result in a substantial net reduction of costs to the Federal Government; and
>
> (vii) who has been determined by the Bureau of Prisons to be at no substantial risk of engaging in criminal conduct or of endangering any person or the public if released to home detention.

§ 60541(g)(5)(A); *see also Operations Memorandum No. 001-2019: Home Confinement Under the First Step Act*, Federal Bureau of Prisons (Apr. 4, 2019), https://www.bop.gov/policy/om/001-2019.pdf. Relevant here, 18 U.S.C. § 16 defines a crime of violence as:

11

> (a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 16.

However, the Supreme Court has ruled that § 16(b) is unconstitutionally vague. *Sessions v. Dimaya*, 138 S. Ct. 1204, 1211 (2018). Thus, an offense is a crime of violence only if it satisfies § 16(a). In 1996, Campbell was twice convicted of domestic abuse assault under Iowa law. Doc. No. 27 at ¶¶ 38, 39. It is unclear how the BOP determined that Campbell's 1996 domestic abuse assault convictions fall within the scope of § 16(a). The PSR did not specify under which section of Iowa's domestic abuse assault statute (Iowa Code § 708.2A) Campbell was convicted. There was not a finding at his sentencing hearing that they were crimes of violence. Further, I note that another judge of this court has recently held that a defendant's conviction for domestic abuse assault under Iowa does not qualify as a crime of violence based on recent Eighth Circuit law. *See United States v. Freie*, No. CR17-3049-CJW, Doc. No. 36 (N.D. Iowa Jan. 13, 2020) (Williams, J.).

Like home confinement pursuant to the CARES Act, the Attorney General, and by delegation the BOP, has the discretion and exclusive authority to place a defendant on home confinement pursuant to EOHDP. *See United States v. Gajewski*, No. 1:14-CR-84, 2020 WL 1066300, at *2 (E.D. Tex. Mar. 4, 2020); *Marshall v. English*, No. 19-3113-JWL, 2019 WL 3252742, at *3 (D. Kan. July 19, 2019); *Melot v. Bergami*, No. EP-19-CV-104-PRM, 2019 WL 1793361, at *3 (W.D. Tex. Apr. 23, 2019). At most, I may make a recommendation that the BOP place Campbell on home confinement pursuant to EOHDP. *See Gajewski*, 2020 WL 1066300, at *2.

### 3. Discussion

#### a. CARES Act

There is no dispute that Campbell has been a model inmate. He has been detained since approximately July 11, 2003, and he entered BOP custody on approximately March 22, 2004. Doc. No. 8; Doc. No. 30. During the 16 years he has been in the BOP system, he has "maintained clear conduct." Doc. No. 38-5 at 2. He has completed drug, educational and release programming. *Id.* at 2–3. He paid his court assessment and is making timely child support payments. *Id.* at 4. He has had 12 unsupervised furloughs for medical reasons and a 16-hour social furlough to attend a funeral. Doc. No. 33 at 4; Doc. No. 38-5 at 2. He is classified at a minimum-security level. Doc. No. 38-5 at 1. He has held numerous work assignments and receives consistently positive reviews:

> Campbell currently receives outstanding work reports from staff supervising the Lloyd Housing Unit Orderlies. He has displayed a strong work ethic and the ability to perform all assigned duties with little supervision. He also serves the Yankton Community by working as an Orderly at the Corps of Engineers Dam in Yankton. Campbell has consistently displayed a strong work ethic and skill during his incarceration period.

*Id.*

Before the COVID-19 pandemic, Campbell worked at the Lewis and Clark Visitor Center at the Gavins Point Project in Nebraska. Doc. No. 38-4. This is a "top tier" job at Yankton FPC. Doc. No. 38-6 at 1. It required Campbell to leave Yankton FPC five days a week and travel to the Visitor Center, unsupervised. Doc. No. 33 at 4. Campbell's supervisor, Park Ranger Karla Zeutenhorst, described his work responsibilities and performance:

> Mr. Campbell's job was to do the cleaning, snow removal, grounds keeping and light maintenance in and around the visitor center. After showing and explaining the tasks that needed to be done, and the schedule of when they needed to be accomplished, Mr. Campbell took to the job immediately. He completed any job task he was asked to do in a timely and efficient manner. He was conscientious enough to check with me to make sure [h]e was doing the job up to my expectations.

13

> In addition, Mr. Campbell did cleaning and maintenance that was not listed a[s] part of his job duties. If he saw something that needed to be cleaned and was not on the list, he did it regardless. The same was true for maintenance. He found things in the center that were broken or not functioning correctly and he fixed what he could. If he was unable to fix it he immediately told me so I could notify our maintenance staff. Mr. Campbell found a safety issue involving a short in a light fixture that could have resulted in a fire if he had not brought it to my attention. This allowed me to get an[] electrician to fix the issue.
>
> I found Mr. Campbell to be extremely dedicated to doing a good job. He worked efficiently and had high standards for himself with regards to the work he was doing. I felt he was dedicated to doing a good job and appreciated the opportunity to work outside the camp. He kept busy at all time and at no time did i[t] feel like I had to remind him to keep working. He was committed to that.
>
> Part of my job with the inmate program is to help individuals gain some job experience and to become accustom to working in a "normal" setting again. I want to make sure the individuals can take direction, work hard, and get work done efficiently. Though I only had the opportunity to work with Mr. Campbell for a few months before the COVID-19 pandemic caused the Prison Camp to keep the inmates at the camp, I feel he is ready for the challenges that being out of prison would present him. He indicated to me he was ready to get out and never wanted to do anything that would put him back into prison again. Based on my observation, I believe Mr. Campbell is ready to get out of prison and go back to leading a productive life.

Doc. No. 38-4.

> The BOP agrees with Ranger Zeutenhorst:
>
> Campbell has displayed excellent work and social skills throughout his incarceration period. He has maintained an appropriate rapport with both staff and inmates, maintained clear conduct, participated in drug treatment and release preparation programming, and fulfilled and made timely payments on his court-ordered financial obligations. He is expected to make a successful transition back into the community.

Doc. No. 38-5 at 4. Campbell's behavior during his incarceration has convinced the BOP and his work supervisor that he will be successful upon release. This supports a recommendation for home confinement.

14

That said, the present offense conduct is serious and Campbell's criminal history is lengthy. However, his offense did not involve violence and Campbell's criminal history is nonviolent except for his two 1996 domestic abuse assault convictions discussed above. Doc. No. 27 at ¶¶ 36–48. His criminal behavior appears to have been driven, at least in part, by his cocaine and methamphetamine addiction. Campbell reported that he was a heavy user of cocaine and methamphetamine and was only abstinent from those drugs while incarcerated. *Id.* at ¶ 67. He last used drugs on the date of his arrest for the instant offense. *Id.* Further, Campbell's record while incarcerated demonstrates that he is unlikely to commit further crimes or present any risk to the community.

Campbell also has a release plan. He plans to reside with his daughter in Carroll, Iowa. Doc. No. 38-6 at 1. His daughter can assist him with transportation and finding health care and drug treatment resources. *Id.* He also plans to obtain employment once he is able. *Id.*

Campbell's age and health conditions also make him an ideal candidate for a CARES Act recommendation. Dr. David Rosenthal reviewed Campbell's BOP medical records and prepared a report, at the request of Campbell's counsel, summarizing Campbell's health conditions and giving his opinion on the risk COVID-19 poses to Campbell. Doc. No. 38-1. Dr. Rosenthal is an Assistant Professor at the Yale School of Medicine. Doc. No. 38-2. He is also the Medical Director of the ShelterOne COVID Respite Unit in New Haven, Connecticut. *Id.* Dr. Campbell provided the following opinion:

> Mr. Campbell is a 60 year old Caucasian male with notable past medical history of chronic kidney disease stage IIIA (moderate; GFR=45-59mL/min), chronic nephrolithiasis, myalgias, and history of left tibial osteomyelitis in 2013. . . .
>
> Given what we know and the multiple unknowns regarding this novel virus, it is my medical opinion that given this patent's age and his comorbidity of chronic kidney disease, he would be deemed high-risk for a poor clinical outcomes and severe illness if he developed COVID-19 illness.

Doc. No. 38-1.

15

The Government does not dispute Dr. Rosenthal's opinion. As of June 23, 2020, no cases of COVID-19 at Yankton FPC had been reported.[2] However, without knowing whether the BOP is actively testing inmates and staff members for COVID-19 at Yankton FPC, the lack of active confirmed cases does not mean COVID-19 is not present at the facility. Nor does it mean there will not be a future outbreak at the facility. As the Government acknowledges, despite extensive measures to prevent transmission, more federal inmates will inevitably contract COVID-19 going forward.[3] *See* Doc. No. 39 at 6 n.2. Campbell is at some risk of catching COVID-19 at Yankton FPC and is at risk of serious illness if he does.

Another factor that is not dispositive, but is worth noting, is that Campbell would likely have already been released if he were sentenced according to the law as it exists today. His base offense level would be 32 rather than 34 because of Amendment 782 ("all drugs minus two" Amendment). He would no longer receive a Chapter Four Enhancement. *See* United States Sentencing Guideline (U.S.S.G.) § 4B1.1. His 1995 conviction for possession of methamphetamine with intent to sell no longer meets the definition of a serious drug offense and his 1998 conviction for third degree attempted burglary no longer qualifies as a crime of violence predicate offense. U.S.S.G. § 4B1.2; Doc. No. 27 at ¶¶ 30, 36, 46. Thus, with a three-level reduction for acceptance of responsibility Campbell's total offense level would be 39. His criminal history category would likely remain at VI, and therefore, his guideline range today would likely be 151 to 188 months, rather than 262 to 327 months.

---

[2] *COVID-19 Cases*, Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited June 24, 2020).

[3] Other BOP facilities have experienced large COVID-19 outbreaks. For example, as of June 21, 2020, 705 inmates, or 61 percent of inmates, have tested positive for COVID-19 at Butner Low FCI, and 12 of those have died. At Elkton FCI, 656 inmates (29 percent of inmates) have tested positive, 9 of which have died. At Terminal Island FCI, 691 inmates (70 percent of inmates) have tested positive, and 9 of those have died. *COVID-19 Cases*, Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited June 22, 2020).

Further, Campbell's mandatory minimum today would be 10 years, not 20 years. Under the FSA, the 21 U.S.C. § 851 enhanced penalties for Class A drug felonies were amended from life to 25 years for defendants who have had two or more prior qualifying serious drug offenses, and amended from 20 years to 15 years for defendants who have had one prior qualifying drug offense. Pub. L. No. 115-391, § 401(a)(2)(A), 132 Stat. 5194, 5220. The FSA also amended the definition of a "serious drug offense." *Id.* § 401(a)(1). The prior offense used for purposes of the § 851 enhancement, Campbell's 1995 conviction for possession of methamphetamine with intent to sell, no longer meets the definition of a serious drug offense because he did not serve a term of imprisonment of at least 12 months. Doc. No. 27 at ¶ 36. While the Government chose to pursue only the 1995 conviction as a § 851 enhancement at sentencing, it did file a notice that it had also intended to use Campbell's 1998 conviction for possession of a controlled substance. Doc. No. 27 at ¶ 42; Doc. No. 18 at 2. However, that conviction would also not qualify as a serious drug offense because it involves only the possession of a controlled substance, not possession with intent to distribute or manufacture. *See* 18 U.S.C. § 924(e)(2)(A)(ii). Because of the reduced statutory minimum, reduced enhancements and the fact that Campbell has already served more than the top of what would be his current guideline range, it is very likely that if Campbell were sentenced today he would receive a sentence shorter than the one he has already served.

For all of these reasons, I recommend that Campbell be placed on home confinement for the remainder of his sentence pursuant to the CARES Act.

### b. *EOHDP*

Campbell also appears to be an appropriate candidate for EOHDP. He is 60 years of age and has served two-thirds of his sentence. The present offense is not a crime of violence or a sex offense. Campbell has not escaped, or attempted to escape, from a BOP facility. His 1996 convictions for domestic abuse assault were not found to be crimes of violence at his sentencing hearing. With the limited information the PSR

17

Case 5:03-cr-04020-LTS-KEM   Document 43   Filed 06/26/20   Page 17 of 19

provides and recent caselaw, it does not appear that such a finding could be made now. Thus, Campbell does not have a crime of violence or a sex offense in his criminal history.

The BOP must also determine, on the basis of information used to make custody classifications, whether Campbell has a history of violence. As noted above, Campbell has a minimum-security level classification and is one of the few inmates at Yankton FPC who are allowed to travel unsupervised outside the facility to his work assignment. Thus, notwithstanding Campbell's 1996 convictions for domestic abuse assault, it does not appear that the BOP is treating Campbell as an inmate who has a history of violence.

Finally, the BOP must determine that Campbell is not at a substantial risk of engaging in criminal conduct or of endangering any person or the public if released to home detention. The BOP appears to have already made this determination. *See* Doc. No. 38-5 at 4 ("He is expected to make a successful transition back into the community."). Thus, while my analysis of the EOHDP factors is not binding on the BOP, I find it appropriate to recommend that he be placed on home confinement.

## V. CONCLUSION

For the foregoing reasons, Campbell's motions (Doc. Nos. 33, 47) for compassionate release are **denied**. However, I **recommend** to the BOP that Campbell be placed on home confinement for the remainder of his sentence pursuant to the Elderly Offender Home Detention Program (EOHDP) of the First Step Act and/or § 12003(b)(2) of the CARES Act. The Clerk's office is directed to provide a copy of this order to the BOP institution where Campbell is incarcerated.

**IT IS SO ORDERED.**

**DATED** this 26th day of June, 2020.

_____
Leonard T. Strand, Chief Judge