# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. KURT ALAN CAMPBELL, Defendant. | No. CR03-4020-LTS<br><br>**MEMORANDUM OPINION AND ORDER** |

_____

## I. INTRODUCTION

This case is before me on defendant Kurt Alan Campbell's motion (Doc. No. 48) for compassionate release. The Government has filed a response (Doc. No. 51) and Campbell has filed a reply (Doc. No. 52). Oral argument is not necessary. *See* Local Rule 7(c).

## II. BACKGROUND

On October 31, 2003, Campbell pleaded guilty to one count of conspiracy to manufacture and distribute 50 grams or more of actual methamphetamine after a prior felony drug conviction in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii), 846 and 851. *See* Doc. No. 19. At Campbell's sentencing hearing on January 26, 2004, United States District Judge Mark W. Bennett calculated a guideline range of 262 to 327 months, based on a total offense level of 34 and a criminal history category VI. Doc. No. 27-1 at 2. Because the Government had filed a 21 U.S.C. § 851 prior felony drug offense enhancement notice, Campbell's mandatory minimum sentence was 240 months. Doc. No. 27 at ¶ 78. Judge Bennett sentenced Campbell to 280 months' imprisonment. Doc. No. 26.

On April 15, 2020, Campbell filed a pro se motion (Doc. No. 33) for compassionate release. On April 29, 2020, I appointed the Federal Public Defender to represent him. Doc. No. 34. On May 13, 2020, Campbell filed an amended motion (Doc. No. 37), through counsel, for compassionate release. On June 26, 2020, I denied Campbell's request for compassionate release because he did not exhaust administrative remedies as required by 18 U.S.C. § 3582(c)(1)(A). Doc. No. 43 at 5–9. However, I recommended to the Bureau of Prisons (BOP) that Campbell be placed on home confinement for the remainder of his sentence pursuant to the Elderly Offender Home Detention Program (EOHDP) of the First Step Act and/or § 12003(b)(2) of the Coronavirus Aid, Relief and Economic Security (CARES) Act. *Id.* at 13–18.

On June 30, 2020, Campbell filed a motion (Doc. No. 44), through counsel, for leave to refile his motion for compassionate release because he had then arguably exhausted his administrative remedies. On July 1, 2020, I entered an order (Doc. No. 45) explaining that a denial for failure to exhaust administrative remedies is without prejudice and Campbell could file another motion for compassionate release without leave of the court. On July 6, 2020, Campbell filed the present motion (Doc. No. 48), through counsel, for compassionate release. On July 13, 2020, the Government filed its resistance. Doc. No. 51. On July 20, 2020, Campbell filed his reply. Doc. No. 52.

On July 23, 2020, the Probation office contacted BOP officials at Campbell's facility to inquire whether Campbell would be placed on home confinement pursuant to my prior recommendation. Probation was told that Campbell would not be placed on home confinement at this time and no further information was available. According to the online BOP inmate locator, Campbell is currently at Yankton FPC and his projected release date is May 25, 2023.

## III. DISCUSSION[1]

### A. Exhaustion of Administrative Remedies

On April 30, 2020, Campbell's counsel submitted a request for compassionate release on behalf of Campbell to his warden. Doc. No. 42-1. The request was based on Campbell's health issues and his COVID-19 risk. *Id*. On May 5, 2020, the warden denied the request. Doc. No. 42-2. On July 6, 2020, Campbell filed, through counsel, his present motion for compassionate release. *See* Doc. No. 48. The Government does not contest that Campbell has now exhausted his administrative remedies as required by 18 U.S.C. § 3582(c)(1)(A). *See* Doc. No. 51 at 2, 4.

### B. Extraordinary and Compelling Reasons

Campbell argues that the threat the COVID-19 pandemic poses to him, in light of his age and particular health issues, constitutes extraordinary and compelling reasons for his early release. Doc. No. 49 at 8–10. He argues that he is at a higher risk of contracting COVID-19 at Yankton FPC than he would be if he were released to reside at his daughter's home. *Id*. at 11. The Government acknowledges Campbell's health issues but argue they are not extraordinary and compelling because they are not terminal or debilitating. Doc. No. 51 at 8. The Government also argues that Campbell has not established that he would be less vulnerable to COVID-19 if he were released because there are no reported COVID-19 cases at Yankton FPC. *Id*. at 9.

Campbell also argues that his rehabilitation, in connection with his health issues and COVID-19, can be considered in deciding whether extraordinary and compelling reasons are present. Doc. No. 49 at 11 (citing 28 U.S.C. § 994(t)). The Government does address this argument.

---

[1] The relevant standards for compassionate release motions were discussed in my order on Campbell's first motion for compassionate release. Doc. No. 43 at 2–5.

### 1. COVID-19

Dr. David Rosenthal reviewed Campbell's BOP medical records and prepared a report, at the request of Campbell's counsel, summarizing Campbell's health conditions and giving his opinion on the risk COVID-19 poses to Campbell. Doc. No. 38-1. Dr. Rosenthal is an Assistant Professor at the Yale School of Medicine. Doc. No. 38-2. He is also the Medical Director of the ShelterOne COVID Respite Unit in New Haven, Connecticut. *Id.* Dr. Campbell provided the following opinion:

> Mr. Campbell is a 60 year old Caucasian male with notable past medical history of chronic kidney disease stage IIIA (moderate; GFR=45-59mL/min), chronic nephrolithiasis,[2] myalgias,[3] and history of left tibial osteomyelitis[4] in 2013. . . .
>
> Given what we know and the multiple unknowns regarding this novel virus, it is my medical opinion that given this patent's age and his comorbidity of chronic kidney disease, he would be deemed high-risk for a poor clinical outcomes and severe illness if he developed COVID-19 illness.

Doc. No. 38-1. The Government does not dispute Dr. Rosenthal's opinion. In addition to the medical conditions listed by Dr. Rosenthal, Campbell also suffers from arthritis. Doc. No. 38-3 at 3–4, 46, 70. Further, on March 12, 2020, a physician outside of the

---

[2] Chronic nephrolithiasis means chronic, or recurrent, kidney stones. *Kidney Stones*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/kidney-stones/symptoms-causes/syc-20355755 (last visited July 27, 2020). Campbell's last kidney stone was in March 2020. Doc. No. 38-3 at 113. He also passed a kidney stone in October 2019. *Id.* at 3.

[3] "Myalgia describes muscle aches and pain, which can involve ligaments, tendons and fascia, the soft tissues that connect muscles, bones and organs. Injuries, trauma, overuse, tension, certain drugs and illnesses can all bring about myalgia." *Myalgia*, John Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/myalgia (last visited July 27, 2020).

[4] Osteomyelitis is an infection in a bone. People with chronic health conditions, such as kidney failure, are more at risk of developing osteomyelitis. *Osteomyelitis*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/osteomyelitis/symptoms-causes/syc-20375913 (last visited July 27, 2020).

BOP healthcare system described Campbell's kidney disease as stage IV, rather than stage IIIA. *Id.* at 114.

The Centers for Disease Control and Prevention (CDC) lists categories of people with underlying medical conditions who *are* at an increased risk and categories of people who *might* be at higher risk from severe illness from COVID-19.[5] Campbell fits into at least one of these categories—people with chronic kidney disease. His stage IIIA (or worse) chronic kidney disease places him at an increased risk of severe illness from COVID-19.

Further, Campbell's age might increase his risk of severe complications from COVID-19. He is now 61 years old. The CDC reports that 8 out of 10 COVID-19 deaths reported in the United States have been among adults aged 65 years and older.[6] The CDC also explains that the risk for severe illness from COVID-19 increase with age, with older adults at highest risk.[7] While Campbell is not in the most vulnerable age group, his age still might increase his risk.

The Government argues that extraordinary and compelling reasons are not present here because Campbell's health conditions are neither terminal nor debilitating. I am not required to find that Campbell's health conditions are terminal or debilitating for extraordinary and compelling reasons to be present, although these are relevant factors to consider. Campbell's medical records demonstrate that his health issues are stable and being treated. He has no physical or work restrictions. Doc. No. 38-3 at 78. He requires

---

[5] *People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last visited July 27, 2020).

[6] *Older Adults*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited July 27, 2020).

[7] *Id.*

5

a lower bunk and a second pillow for chronic joint paint. *Id*. He is also assigned medical shoes. *Id*.

Numerous courts have held that a defendant's health condition(s) that increases his risk of serious illness from COVID-19 and the presence of COVID-19 within BOP facilities constitute extraordinary and compelling reasons for compassionate release. *See United States v. Conner*, No. CR07-4095-LTS, 2020 WL 3053368, at *7 (N.D. Iowa June 8, 2020) (collecting cases); *see also United States v. Ledezma-Rodriguez*, --- F. Supp. 3d ---, 2020 WL 3971517, at *6 (S.D. Iowa July 14, 2020) (collecting cases). Further, several courts have found that chronic kidney disease, when considered in light of the increased COVID-19 risk it causes, supports a finding of extraordinary and compelling reasons.

> [T]he CDC has recently included individuals "with chronic kidney disease of any stage" to be at an increased risk "for severe illness from COVID-19." . . . [T]he Court agrees with the findings of several other courts that this risk, in the present context, warrants compassionate release. *United States v. Howard*, 4:15-cr-00018-BR-2, 2020 WL 2200855, at *3 (E.D.N.C. May 6, 2020) (granting compassionate release, in part, because inmate suffers from serious medical conditions including stage 3 kidney disease); *United States v. Saad*, 2:16-cr-20197-DPH-MKM-1, 2020 WL 2251808, at *1 (E.D. Mich. Apr. 29, 2020) (granting compassionate release, in part, because 71-year old inmate suffers from "serious underlying and preexisting medical conditions" including chronic kidney disease); *United States v. Bertrand*, 3:00-cr-00012-LC-1, 2020 WL 2179387, at *1 (N.D. Fla. Apr. 29, 2020) (same); *United States v. Musumeci*, 1:07-cr-00402-RMB-1, [Doc. No. 58] (S.D.N.Y. Apr. 28, 2020) (granting compassionate release, in part, because 66-year old inmate suffers from kidney disease); *United States v. Sanchez*, 1:95-cr-00421-MGC-1, [Dkt. No. 290] (S.D. Fla. Apr. 27, 2020) (granting compassionate release, in part, because 76-year-old inmate suffers from "chronic kidney disease"); *United States v. Williams*, 3:17-CR-121-(VAB), 2020 WL 1974372, at *3 (D. Conn. Apr. 24, 2020) (granting compassionate release, in part, because 62-year old inmate has a "history of being treated for kidney issues").
>
> Indeed, although those with kidney problems appear to be severely impacted by COVID-19 with no precise explanation nor basis, one doctor

concludes that the virus most likely "attaches to the kidney cells and attacks them," requiring patients to go through further immune weakening treatments and causing them to lose kidney function. Lenny Bernstein et al., *Coronavirus Destroys Lungs. But Doctors Are Finding Its Damage in Kidneys, Hearts and Elsewhere*, WASH. POST (Apr. 15, 2020), https://www.washingtonpost.com/health/coronavirus-destroys-lungs-but-doctors-are-finding-its-damage-in-kidneys-hearts-and-elsewhere/.html (last accessed June 26, 2020).

*United States v. Walker*, No. 11-CR-381 (SRN/HB), 2020 WL 4194677, at *4–5 (D. Minn. June 26, 2020).

Additionally, while I appreciate that the BOP has taken many measures to prevent the transmission of COVID-19 among its inmate population,[8] the virus has nonetheless spread through many BOP facilities. As of July 28, 2020, of the 128,954 inmates in BOP-managed institutions and 13,677 in community-based facilities, 10,483 have tested positive.[9] Of those, 101 inmates have died. This corresponds to an infection rate across BOP facilities of 7.3 percent. The national infection rate is 1.3 percent.[10]

As of July 28, 2020, no inmates or staff members have tested positive for COVID-19 at Campbell's facility, Yankton FPC. However, no confirmed cases does not mean that COVID-19 is not present at the facility. Nor does it mean there will not be a future outbreak at the facility. As the Government acknowledges, despite extensive measures

---

[8] According to the BOP's website, those measures have included limiting inmate movement within each facility and between facilities, suspending visits, suspending staff training and travel, screening staff and inmates for COVID-19 symptoms and modifying operations to maximum social distancing to the extent possible. *BOP Implementing Modified Operations*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited July 28, 2020).

[9] *COVID-19 Cases*, Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited July 29, 2020).

[10] This is based on 4,280,135 COVID-19 cases and a population of 330,033,304. *See CDC COVID Data Tracker*, CDC, https://www.cdc.gov/covid-data-tracker/#cases (last visited July 29, 2020); *U.S. and World Population Clock*, United States Census Bureau, https://www.census.gov/popclock/ (last visited July 29, 2020).

7

to prevent transmission, more federal inmates will contract COVID-19 going forward. *See* Doc. No. 51 at 7 n.2. Further, only 38 inmates at Yankton FPC have been tested for COVID-19 since the beginning of the pandemic, and 2 of those are awaiting test results.[11] Yankton FPC houses 354 inmates.[12]

Campbell's plan upon release is to reside with his daughter and two granddaughters at a home in Carroll, Iowa. Doc. No. 38-6. Carroll is located in Carroll County, which has a population of approximately 20,154.[13] There have been 171 COVID-19 cases in Carroll County since the beginning of the pandemic,[14] corresponding to an infection rate of 0.8 percent. While COVID-19 is present in every county in Iowa, the conditions of incarceration inherently limit the social distancing measures that may reduce the risk of exposure. Further, the rate of infection within the BOP is much higher than in the general population of the United States or Carroll County, Iowa.

### 2. *Rehabilitation*

Campbell also argues that his rehabilitation, in connection with his health issues and COVID-19, can be considered in deciding whether extraordinary and compelling reasons are present. Doc. No. 49 at 11. 18 U.S.C. § 994 outline the duties assigned to the United States Sentencing Commission. Section 994(t) provides:

> The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons

---

[11] *COVID-19 Cases*, Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited July 29, 2020).

[12] *FPC Yankton*, Bureau of Prisons, https://www.bop.gov/locations/institutions/yan/ (last visited July 29, 2020).

[13] *Carroll County, Iowa*, Wikipedia, https://en.wikipedia.org/wiki/Carroll_County,_Iowa (last visited July 28, 2020).

[14] *Positive Case Analysis*, COVID-19 in Iowa, https://coronavirus.iowa.gov/pages/case-counts (last visited July 29, 2020).

8

> for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason.

Guideline § 1B1.13 cmt. n.3 echoes the statute, stating: "rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement."

A number of district courts have held that the natural reading of § 994(t) is that a defendant's rehabilitation may be part of the extraordinary and compelling reasons calculation if it is coupled with other reasons. *See United States v. Poole*, --- F. Supp. 3d ---, 2020 WL 4192280, at *6 (W.D. Tenn. July 14, 2020); *United States v. Torres*, --- F. Supp. 3d ---, 2020 WL 2815003, at *8–9 (S.D.N.Y. June 1, 2020); *United States v. Brown*, --- F. Supp. 3d ---, 2020 WL 2091802, at *7 (S.D. Iowa Apr. 29, 2020) ("For the word 'alone' to do any work—as it must—that means courts can consider rehabilitation as part of a compassionate release motion."); *United States v. Marks*, --- F. Supp. 3d ---, 2020 WL 1908911, at *8 (W.D.N.Y. Apr. 20, 2020); *United States v. Wade*, No. 2:99-CR-00257-CAS-3, 2020 WL 1864906, at *5 (C.D. Cal. Apr. 13, 2020); *United States v. Almontes*, No. 3:05-cr-58 (SRU), 2020 WL 1812713, at *8 (D. Conn. Apr. 9, 2020); *United States v. Millan*, No. 91-CR-685 (LAP), 2020 WL 1674058, at *7 (S.D.N.Y. Apr. 6, 2020); *United States v. Rodriguez*, --- F. Supp. 3d ---, 2020 WL 1627331, at *10 (E.D. Pa. Apr. 1, 2020); *United States v. Cantu-Rivera*, No. H-89-204, 2019 WL 2578272, at *2 (S.D. Tex. June 24, 2019).

Based on the text of § 994(t), and absent any contrary argument from the Government, I agree with those courts that have found that a defendant's rehabilitation may be considered in deciding whether extraordinary and compelling reasons are present, if other factors are present. As discussed above, among other issues, Campbell has a medical condition identified by the CDC as increasing his risk for severe illness from COVID-19. Because other factors are present, I find I can consider his rehabilitation.

9

As I stated in my prior order, there is no dispute that Campbell has been a model inmate. He has been detained since approximately July 11, 2003, and he entered BOP custody on approximately March 22, 2004. Doc. No. 8; Doc. No. 30. During the 16 years he has been in the BOP system, he has "maintained clear conduct." Doc. No. 38-5 at 2. He has completed drug, educational and release programming. *Id.* at 2–3. He paid his court assessment and is making timely child support payments. *Id.* at 4. He has had 12 unsupervised furloughs for medical reasons and a 16-hour social furlough to attend a funeral. Doc. No. 33 at 4; Doc. No. 38-5 at 2. He is classified at a minimum-security level. Doc. No. 38-5 at 1. He has held numerous work assignments and receives consistently positive reviews:

> Campbell currently receives outstanding work reports from staff supervising the Lloyd Housing Unit Orderlies. He has displayed a strong work ethic and the ability to perform all assigned duties with little supervision. He also serves the Yankton Community by working as an Orderly at the Corps of Engineers Dam in Yankton. Campbell has consistently displayed a strong work ethic and skill during his incarceration period.

*Id.*

Before the COVID-19 pandemic, Campbell worked at the Lewis and Clark Visitor Center at the Gavins Point Project in Nebraska. Doc. No. 38-4. This is a "top tier" job at Yankton FPC. Doc. No. 38-6 at 1. It required Campbell to leave Yankton FPC five days a week and travel to the Visitor Center, unsupervised. Doc. No. 33 at 4. Campbell's supervisor, Park Ranger Karla Zeutenhorst, described his work responsibilities and performance:

> Mr. Campbell's job was to do the cleaning, snow removal, grounds keeping and light maintenance in and around the visitor center. After showing and explaining the tasks that needed to be done, and the schedule of when they needed to be accomplished, Mr. Campbell took to the job immediately. He completed any job task he was asked to do in a timely and efficient manner. He was conscientious enough to check with me to make sure [h]e was doing the job up to my expectations.

10

In addition, Mr. Campbell did cleaning and maintenance that was not listed a[s] part of his job duties. If he saw something that needed to be cleaned and was not on the list, he did it regardless. The same was true for maintenance. He found things in the center that were broken or not functioning correctly and he fixed what he could. If he was unable to fix it he immediately told me so I could notify our maintenance staff. Mr. Campbell found a safety issue involving a short in a light fixture that could have resulted in a fire if he had not brought it to my attention. This allowed me to get an[] electrician to fix the issue.

I found Mr. Campbell to be extremely dedicated to doing a good job. He worked efficiently and had high standards for himself with regards to the work he was doing. I felt he was dedicated to doing a good job and appreciated the opportunity to work outside the camp. He kept busy at all time and at no time did i[t] feel like I had to remind him to keep working. He was committed to that.

Part of my job with the inmate program is to help individuals gain some job experience and to become accustom to working in a "normal" setting again. I want to make sure the individuals can take direction, work hard, and get work done efficiently. Though I only had the opportunity to work with Mr. Campbell for a few months before the COVID-19 pandemic caused the Prison Camp to keep the inmates at the camp, I feel he is ready for the challenges that being out of prison would present him. He indicated to me he was ready to get out and never wanted to do anything that would put him back into prison again. Based on my observation, I believe Mr. Campbell is ready to get out of prison and go back to leading a productive life.

Doc. No. 38-4.

The BOP agrees with Ranger Zeutenhorst:

Campbell has displayed excellent work and social skills throughout his incarceration period. He has maintained an appropriate rapport with both staff and inmates, maintained clear conduct, participated in drug treatment and release preparation programming, and fulfilled and made timely payments on his court-ordered financial obligations. He is expected to make a successful transition back into the community.

Doc. No. 38-5 at 4.

All of this is extremely impressive. Campbell has been free from disciplinary issues during his entire period of incarceration, participated in extensive programming, made timely payments on financial obligations and received outstanding reviews of his

11

work and social skills. Moreover, he has demonstrated that he is capable of working outside the facility. The BOP and Ranger Zeutenhorst believe Campbell will be successful upon his release from prison.

I find that the combination of Campbell's age, chronic kidney disease and rehabilitation constitute extraordinary and compelling reasons for his early release. Therefore, I will consider whether the remaining factors support granting Campbell's motion.

C. *Section 3553(a) Factors and Danger to Community[15]*

Guideline § 1B1.13(2) provides that compassionate release is appropriate only where "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)[.]" Section § 3582(c)(1)(A) requires a court to consider the factors set forth in 18 U.S.C. § 3553(a) before granting a motion for compassionate release. Section 3553(a) requires that I consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

---

[15] This section is somewhat redundant in light of my prior finding that it would be appropriate for the BOP to move Campbell to home confinement. *See* Doc. No. 43 at 17.

12

> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines [issued by the Sentencing Commission . . .;]
>
> (5) any pertinent policy statement [issued by the Sentencing Commission . . .']
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

The present offense conduct is serious and Campbell's criminal history is lengthy. However, his offense did not involve violence and Campbell's criminal history is nonviolent except for two 1996 domestic abuse assault convictions. Doc. No. 27 at ¶¶ 36–48. His criminal behavior appears to have been driven, at least in part, by his cocaine and methamphetamine addiction. Campbell reported that he was a heavy user of cocaine and methamphetamine and was only abstinent from those drugs while incarcerated. *Id.* at ¶ 67. He last used drugs on the date of his arrest for the instant offense. *Id.*

The Government argues that Campbell would pose a danger to the safety of the community if he were released because he was a significant drug dealer and his criminal history is serious. Doc. No. 51 at 9. This argument disregards Campbell's conduct during his 17 years of incarceration. *See Pepper v. United States*, 562 U.S. 476, 490 (2011) (a court may consider post-sentencing rehabilitation upon resentencing). As described above, Campbell's record while incarcerated strongly suggests that he is no longer a danger to the safety of any other person or the community. In fact, he has already demonstrated that he is not a danger to the safety of the community through his job outside the facility. Further, Campbell will be under supervision for 10 years after his release. *See* Doc. No. 26. This will help reduce whatever risk, if any, Campbell may pose to the public. *See United States v. Schmitt*, No. CR12-4076-LTS, 2020 WL 96904, at *5 (N.D. Iowa Jan. 8, 2020).

Campbell also has a suitable plan upon his release. He plans to reside with his daughter and her two minor children in Carroll, Iowa. Doc. No. 38-6 at 1. There are no guns in his daughter's home. *Id*. His daughter can assist him with transportation and finding health care and drug treatment resources. *Id*. Campbell also plans to obtain employment once he is able. *Id*.

Another factor that is not dispositive, but is worth noting, is that Campbell would likely have already been released if he were sentenced according to the law as it exists today. As I discussed in my order on Campbell's first motion for compassionate release, Campbell would no longer be a career offender, his mandatory minimum would be 10 years and his guideline range would likely be 151 to 188 months. *See* Doc. No. 43 at 16–17. Campbell has already served more than the top of what would be his current guideline range.

Taking into account the 17 years Campbell has already served in prison, his rehabilitation and his guideline range today, I find the time he has already served satisfies the goals of sentencing. As such, I find that Campbell is eligible for compassionate release and will grant his motion.

## IV. CONCLUSION

For the foregoing reasons:

1. Defendant Kurt Alan Campbell's motion (Doc. No. 48) for compassionate release is **granted**. However, execution of this order is **stayed** for fourteen (14) days to allow the Bureau of Prisons and United States Probation an opportunity to make the necessary arrangements for Campbell's release.

2. Based on the stay of execution described in the preceding paragraph, Campbell's term of imprisonment is hereby **reduced** to **time served as of August 14, 2020**.

3. All other aspects of the judgment (Doc. No. 26) remain in effect, including those related to Campbell's term of supervised release.

4. The Clerk of Court shall provide a copy of this order to the Probation Office and the institution where Campbell is incarcerated.

**IT IS SO ORDERED.**

**DATED** this 31st day of July, 2020.

_____
Leonard T. Strand, Chief Judge

15

Case 5:03-cr-04020-LTS-KEM   Document 53   Filed 07/31/20   Page 15 of 15